NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0023n.06

Case No. 23-1756

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Jan 17, 2025

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| JOSEPH P. STANISLAW; LARRAINE M. STANISLAW, | ) ) ) | |
| Plaintiffs - Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| THETFORD TOWNSHIP, MICHIGAN; DENNIS BLOSS; STUART WORTHING; ROBERT SWARTWOOD; MARC ANGUS, | ) ) ) ) | OPINION |
| Defendants - Appellees. | ) | |

Before: GIBBONS, WHITE, and MURPHY, Circuit Judges.

GIBBONS, J., delivered the opinion of the court in which MURPHY, J., concurred. WHITE, J. (pp. 16–35), delivered a separate dissenting opinion.

JULIA SMITH GIBBONS, Circuit Judge. Joseph and Larraine Stanislaw are owners of an automobile-related business in Thetford Township, Michigan. The Stanislaws have been living—and attempting to operate their business—on the same parcel of land in the Township since 1983. From 2005 to 2018, after receiving citizen complaints about the state of the Stanislaws' property, the Township denied the Stanislaws licenses to operate their business. The Stanislaws assert an equal protection class of one claim, arguing that the Township and its officials intentionally discriminated against the Stanislaws in comparison to other similarly situated businesses with no rational basis for the differential treatment. Because the Stanislaws have failed to carry their heavy burden, we affirm the judgment of the district court for the Township and its officials.

I.

These parties are before the Sixth Circuit for a third time, presenting a factual and procedural history that spans forty years. The Stanislaws purchased a property in Thetford Township in May 1983. That same year, the Township Supervisor authorized the Stanislaws to conduct automobile sales on the property. As a part of this process, the Stanislaws filed a petition for site plan review with the Thetford Township Planning Commission; the site plan contemplated that the property would be used for a residence and for used automobile sales and servicing. In 1984, the Stanislaws added a fence to the outside storage area, as required by the ordinance in effect at the time, Ordinance No. 3. But in 1989, the Township replaced Ordinance No. 3 with Ordinance No. 78, which "vastly changed the conditions and requirements of zoning in the Township, including on" the Stanislaws' property. DE 62-2, Decl., Page ID 923. Via Ordinance No. 78, the Stanislaws' property was zoned as General Commercial.

In 1993, the Stanislaws were licensed for three types of business activity on their property: Class B, "Used Vehicle Dealer," which allowed them to "buy and sell used vehicles"; Class C, "Used Vehicle Parts Dealer," which allowed them to "buy and dismantle vehicles to sell parts and remaining scrap" and also to "buy and sell used late model major component parts"; and Class E, "Distressed Vehicle Transporter," which allowed them to "buy vehicles only for resale to Class 'C' or Class 'F' dealers." DE 62-2, Ex. 4, Page ID 1117–18. The Stanislaws' last full year in operation was 2001; they did not operate their business from 2002 through 2005 due to Mr. Stanislaw's health issues. The Stanislaws continued to use the property as their residence.

Notably, Ordinance No. 78 does not permit junk yards in areas zoned as General Commercial. Per Ordinance No. 78, "junk" is "[a]ny *motor vehicles*, machinery, appliances, products or merchandise *with parts missing* or *other scrap materials that are damaged,*

*deteriorated*, or are in a condition which prevents their use for the purpose of which the product was manufactured," and a "junk yard" is an "area where waste [and] used or second hand materials . . . including but not limited *to junk, scrap iron and other metals*, paper, rags, *rubber tires* and bottles" are bought, sold, exchanged, disassembled, or stored. DE 62-2, Ordinance No. 78, Page ID 966. The Ordinance goes on to state that "[a] junk yard includes automobile wrecking yards and includes any open area of more than two hundred (200) square feet for storage, keeping, or abandonment of junk." *Id.*

In September 2005, neighboring property owners of the Stanislaws, Daniel and Marsha Case and Lillian Sheppard, complained to the Township that the Stanislaws were operating "a Junk Yard" and that their business had "become an eyesore and possibly a nuisance." DE 62-2, Ex. 16, Page ID 1174. The neighbors urged the Township to "investigat[e]." *Id.* A few months later, in December 2005, the Stanislaws applied for two business licenses—Class B, Used Vehicle Dealer, and Class E, Distressed Vehicle Transporter. After inspecting the property, Township building inspector Marc Angus disapproved the Stanislaws' application. On the disapproval form, Angus wrote that the Stanislaws' property was not properly zoned for a Class E license, that it required a fence for outside storage, that the partial fence on the property was in disrepair, and that the Stanislaws were operating an automobile graveyard.

"Without first appealing to the [Township Zoning Board of Appeals (ZBA)] or the Michigan state courts," the Stanislaws in 2009 initiated an action in federal court challenging the 2005 denial. *Stanislaw v. Thetford Twp.*, 515 F. App'x 501, 502–03 (6th Cir. 2013) (*Stanislaw I*). While this action was pending, the Stanislaws in 2011 again applied for licenses—this time, Class B, Used Vehicle Dealer, and Class C, Used Vehicle Parts Dealer—and were denied. The Stanislaws appealed this 2011 denial to the ZBA, which affirmed the denial. In its determination,

the ZBA emphasized that the Stanislaws' property "is properly zoned for a Class B license" and that if the Stanislaws "submit a Zoning Approval for only a Class B license, the Zoning Approval form must be approved." DE 60-5, ZBA Meeting Minutes July 27, 2011, Page ID 593.

Instead of filing for a Class B license, the Stanislaws appealed the ZBA's decision to the Genesee County Circuit Court. After a hearing, the Genesee County Circuit Court affirmed the ZBA's decision to uphold the 2011 denial of the licenses. The circuit court found no abuse of discretion by the ZBA. (*Id.*) The Stanislaws did not appeal this decision.

In 2013, this court affirmed the district court's grant of summary judgment to the Township on the Stanislaws' claims arising from the 2005 denial. *Stanislaw I*, 515 F. App'x at 507. Following that, in 2015, the Stanislaws appeared before the Thetford Township Planning Commission to "ascertain the fencing requirements for their property." DE 1-1, Compl., Page ID 14; DE 60-10, Thetford Twp. Planning Commission Mtg. Minutes, Page ID 653–54. At this meeting, Daniel Bloss, a member of the Planning Commission, and Stuart Worthing, the Township building inspector after Marc Angus, told the Stanislaws they could not have a business and a residence on the same property. The Stanislaws appealed to the ZBA the determination that their plot should be treated as residentially zoned. In July 2016, the ZBA affirmed the determination to treat the plot, despite being in the General Commercial district, as residentially zoned. The Stanislaws appealed this decision to the Genesee County Circuit Court, and the circuit court reversed and remanded back to the ZBA. Following this, in 2017, the ZBA reversed itself and acknowledged that the Stanislaws could operate a business and maintain a residence on the same plot. The next year, in 2018, the Stanislaws applied for a Class B license and were approved.[1]

---

[1] During the pendency of this litigation, the Stanislaws in 2022 were granted Class B, Class C, and Class E licenses.

Also in 2018, the Stanislaws initiated this action in Michigan state court, alleging, among other claims, discriminatory treatment by the Township, Marc Angus, Daniel Bloss, and Stuart Worthing in violation of the Equal Protection Clause of the Fourteenth Amendment. Following removal to federal court, a panel of this court in 2021 held that, while "claims or issues solely based on the events of 2005 to 2009" were precluded by the *Stanislaw I* litigation, the Stanislaws could continue to press forward on their claims of discriminatory treatment post-2009. *Stanislaw v. Thetford Twp., Mich., et al.*, No. 20-1660, 2021 WL 3027195, at *5 (6th Cir. July 19, 2021) (*Stanislaw II*). After discovery, the district court granted summary judgment for the Township and the Township officials on the Stanislaws' equal protection class of one claim. The district court declined to exercise supplemental jurisdiction over the Stanislaws' state law claims. The Stanislaws timely appealed.

II.

We review the district court's grant of summary judgment de novo. *Jones v. Producers Servs. Corp.*, 95 F.4th 445, 449 (6th Cir. 2024). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To survive the defendants' motion for summary judgment, the Stanislaws "must establish that there is a genuine issue of material fact" on their equal protection class of one claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). At this stage, we view all facts and make all inferences in the light most favorable to the Stanislaws, the non-moving party. *See id.* at 587.

We begin with a few preliminary matters. We found the Stanislaws' briefing difficult to follow as to what actions they were now challenging, so we asked about this issue at oral argument. First, given the prior litigation between these parties, counsel for the Stanislaws acknowledged

that this appeal does not challenge Angus's 2005 denial. Oral Argument at 1:23–:45, *Stanislaw v. Thetford Twp., Mich., et al.* (No. 23-1756). The prior litigation has already addressed any claims arising out of the 2005 denial. *See Stanislaw I*, 515 F. App'x at 503–04; *Stanislaw II*, 2021 WL 3027195, at *5. Second, counsel for the Stanislaws conceded at oral argument that the Stanislaws were not challenging Angus's 2011 denial. *See* Oral Arg. at 4:06–:20. This concession effectively waived our review of any claim tied to the denial of the 2011 applications. *See United States v. Duval*, 742 F.3d 246, 255 (6th Cir. 2014); *cf. Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1038–39 (6th Cir. 2024). And even if claims based on the 2011 denial were not waived because counsel misspoke as the dissent notes, they are still precluded. The Genesee County Circuit Court affirmed Angus's 2011 denial (and the ZBA's 2011 decision upholding that denial), finding that "the law has been followed, proper procedure has [been] followed, [and] there's competent material and substantial evidence on the record," leading the court to conclude that "the ZBA . . . exercised its discretion" and that there was "[n]o abuse of discretion on the record before the ZBA." DE 60-7, Genesee County Circuit Court Hr'g Tr., Page ID 638–39, 641. The Stanislaws did not appeal this judgment. Res judicata applies to the Genesee County Circuit Court's final judgment, thus precluding our review of Angus's 2011 denial or the ZBA's 2011 resolution affirming that denial.[2] *See Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981).

---

[2] The dissent frames our decision to raise the issue of res judicata as error because it was *sua sponte* citing a quote out of context from *Hutcherson v. Lauderdale County*, 326 F.3d 747, 757 (6th Cir. 2003). *See* Dissent at 19. The full context of that quote notes that the Supreme Court and this circuit have held that courts may take the initiative to assert the res judicata defense sua sponte to conserve judicial resources, prevent unnecessary judicial waste, and protect litigants from multiple lawsuits among many other reasons. *Hutcherson*, 326 F.3d at 757. This case—given its long-running litigation and multiple state and federal court decisions—may be the quintessential candidate for consideration of a res judicata claim sua sponte. *See generally Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) (describing res judicata as having "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation").

The dissent claims that Michigan's state circuit court decisions do not have res judicata effect as to their constitutional claims. *See* Dissent at 22. The decision the dissent cites for that proposition, *Houdini Properties, LLC v. City of Romulus*, declined to apply res judicata to constitutional claims on a plaintiff's appeal of a ZBA board decision. 743 N.W.2d 198, 198–99 (Mich. 2008). But as our circuit later noted in discussing that case, res judicata did not apply in *Houdini Properties* because the Michigan circuit court was reviewing the ZBA board decision "solely as an appeal [of the ZBA Board] and review[ing] it as such." *Jon Jon's, Inc. v. City of Warren*, 534 F. App'x 541, 544 (6th Cir. 2013) (emphasis omitted). Here, the Michigan circuit court explicitly considered the equal protection argument and rejected it. So, unlike *Houdini Properties*, in the case before us, the Michigan court *did* treat "Plaintiffs' case as involving an appeal and a separate civil counterclaim[,]" which would "indeed . . . be a crucial distinction [from *Houdini Properties*]." *Jon Jon's Inc.*, 534 F. App'x at 544–45. Therefore, the analysis the dissent proffers concerning where res judicata would not apply to the Stanislaws.

Given the preclusive effect of the prior litigation, counsel's waiver, and the Genesee County Circuit Court's final judgment, the Stanislaws are left with an equal protection class of one challenge to differential treatment between themselves and similarly situated businesses between 2013 and 2018.[3] As discussed below, the Stanislaws cannot carry their heavy burden to prove

---

[3] The dissent rightly notes that in *Stanislaw II*, the court did not hold that the events in *Stanislaw I* could be entirely disregarded. *See* Dissent at 20–22. The reason for that, however, is that the "factual allegations . . . [were] materially distinct from the claim that was pled in *Stanislaw I*[.]" *Stanislaw II*, 2021 WL 3027195, at *3. As noted, the panel also held that the Stanislaws could not relitigate any issues or claims based solely on the events of 2005 or 2009 as those were subject to res judicata. *Id.* at *5. In this current dispute, any equal protection class of one claims could have been brought in the prior litigation based on the alleged prior actions of the Township where the Stanislaws were alleged to have been "intentionally treated differently from others similarly situated and [where] there [was] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Thus, those prior actions are precluded from consideration now. Ultimately, under the dissent's theory of res judicata there would be a

either (1) the existence of similarly situated businesses in all material respects or (2) the absence of a rational basis for any differential treatment.

III.

On appeal, the Stanislaws assert an equal protection class of one claim: They argue that (1) the Township and its officials "intentionally treated" them "differently from others similarly situated" in all material respects, and (2) "that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012). The Stanislaws cannot carry their burden to establish a genuine issue of material fact on either prong. We have previously emphasized that courts should review class of one claims "skeptically" as they have the potential to "effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461–62 (6th Cir. 2012) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1211 (10th Cir. 2004)). The Stanislaws cannot overcome their "heavy burden." *Id.* at 462 (internal citation omitted).

A.

We begin with the Township. The Stanislaws argue that Thetford Township violated the Equal Protection Clause of the Fourteenth Amendment under their class of one theory. But they overlook an important step. The Stanislaws are proceeding under 42 U.S.C. § 1983, the vehicle by which they may bring a federal claim against the Township. While municipalities are "persons" for purposes of § 1983, *see Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 (1978), a municipality cannot be held liable under a theory of respondeat superior. *See id.* at 691;

---

*Stanislaw IV*, a *Stanislaw V*, and so on whereby the Stanislaws could keep challenging and relitigating the *past* actions of the Township so long as they can supplement with a new action. We cannot endorse such a scenario.

*City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, the Stanislaws must identify a municipal "policy," "custom," or "practice." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429, 432 (6th Cir. 2005). While their complaint and counsel's Rule 28(j) letter attempt to tie the § 1983 claim to the actions of the ZBA, the Stanislaws' briefing before this court never cites *Monell*, nor does it identify any municipal policy, practice, or specific ZBA action.[4] This would indicate the Stanislaws have abandoned any claim against the Township. *See Hardrick v. City of Detroit*, 876 F.3d 238, 243–44 (6th Cir. 2017) (explaining that *Monell* claims are generally forfeited when not raised in the appellant's opening brief). The dissent frames the Stanislaws' failure to pursue a *Monell* claim as merely a "missed citation to [a] legal authority." Dissent at 17 (quoting *United States v. Charles*, 843 F.3d 1142, 1147 (6th Cir. 2016). But a *Monell* claim is not a mere case citation, it *is* the argument with *Monell* and its progeny setting out a very specific way in which plaintiffs are to establish municipal liability under § 1983.[5] Thus a failure to even raise the *Monell*

---

[4] In seeking to show alleged municipality actions, the dissent cites an action by a ZBA chairman and a ZBA member. *See* Dissent at 17. But these are not *municipality* actions. *See City of Canton*, 489 U.S. at 385 ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. . . . It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983.") (citations omitted). It is not enough to merely the cite the actions of members of a government body with power backed by the ZBA to find a municipality liable as "[d]iscretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from *respondeat superior* liability." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).

[5] This is why case law explicitly refers to *Monell* in the context of a *Monell* "claim" or *Monell* "liability," which establishes what a plaintiff *must* prove in order to succeed on a *Monell* claim or under *Monell* liability. *See, e.g.*, *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017) (establishing requirements to succeed on a *Monell* claim); *see also, e.g.*, *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 740 (9th Cir. 2020) (describing the unique process on how to obtain § 1983 against a municipality as a "*Monell* claim"); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (describing the unique process a plaintiff must satisfy to establish "*Monell* liability").

*argument* of course can constitute a waiver of the *Monell argument*. But, even if the Stanislaws had properly raised *Monell* liability, they cannot identify any ZBA action during the time period at issue in this appeal that evinced differential treatment from others similarly situated for which there was no rational basis.

Between 2013 and 2018, the only adverse ZBA action on the record before us occurred on July 27, 2016. At that meeting, the Stanislaws were appealing the zoning decision to treat their plot as residential, instead of as a commercially zoned plot. This was after the Stanislaws had halted operation of their business back in 2002, lost their business licenses in 2005, yet lived on the same property continuously before coming before the ZBA in 2016. The ZBA resolved to continue to treat the Stanislaws' plot as residentially zoned. The Stanislaws then appealed this decision to the Genesee County Circuit Court, and that court reversed the ZBA, leading the ZBA to reverse its earlier decision and acknowledge that the Stanislaws could both operate a business and maintain a residence on the plot.

Even if the Stanislaws had properly argued that the July 2016 ZBA action constituted an "action[] taken by officials with final decision-making authority," *see Thomas*, 398 F.3d at 429, the evidence does not create a genuine dispute as to whether the ZBA's action "intentionally treated" the Stanislaws "differently from others similarly situated." *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023) (quoting *Olech*, 528 U.S. at 564). The key here is the element of intent. "[T]he unequal application of a facially neutral law is not a denial of equal protection unless" the plaintiff can show "an element of intentional or purposeful discrimination." *Id.* (internal citation omitted). Because plaintiffs usually do not have direct evidence of discrimination, they may "demonstrate intentional discrimination through circumstantial evidence." *Id.* at 528. For a class of one claim, this requires demonstrating "an inference of

intentional discrimination arising from the fact that the adverse treatment . . . was such a stark outlier from an otherwise consistent pattern of favorable treatment in similarly situated cases." *Id.* (internal citation omitted). The Stanislaws cannot show that they were a "stark outlier." *Id.*

True, determining whether a comparator is "similarly situated" in all material respects is typically a question for the jury. *Loesel*, 692 F.3d at 463. But that is not so where the Stanislaws have failed to create a genuine issue of material fact for a jury to consider. There is not enough evidence in the record before us to show any similarly situated businesses (in all material respects) that were treated more favorably. The Stanislaws assert that John Belott & Son, LLC, Hi-Speed Auto, Duquette's Garage, Inc., and Monster Auto are similarly situated businesses. But none of their alleged comparators are similarly situated in all *material* respects. John Belott & Son has only applied for and received a Class B license—it has never applied for a Class C or E license. The same goes for Duquette's Garage—it has only applied for and received a Class B license. While Duquette's does have both a residence and business on the same parcel, it has never sought a Class C or E license, as the Stanislaws have. As for Monster Auto, there is no information in the record about what business licenses it held, and the business closed in 2019. Hi-Speed is the only business on the record that has applied for and received both Class B and C licenses; still, Hi-Speed has never applied for a Class E license. Nor is there any evidence that Hi-Speed has served as both a business and a residence on the same plot. As a general matter, there is a lack of concrete detail in the record about these various businesses—for example, whether they are the same size, whether they border residences, or whether they conduct the same business activities (for example, used car sales versus used parts dealer versus distressed vehicle transporter). And finally, for purposes of the July 2016 ZBA action, there is no evidence that any of the other businesses stopped operating and functioned only as a residence for approximately 14 years before any ZBA action.

Contrary to the arguments raised by the dissent, the Stanislaws have simply not placed enough evidence in the record about these businesses to create a genuine issue of material fact.

Nor can the Stanislaws overcome the rational basis prong of the class of one inquiry. The rational basis standard of review is "'a paradigm of judicial restraint,' growing out of recognition that 'equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices.'" *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 791 (6th Cir. 2005) (quoting *FCC v. Beach Cmmc'ns, Inc.*, 508 U.S. 307, 313–14 (1993)). Indeed, "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Id.* As a result of this strict standard of review, we must sustain the challenged government action "if *any* conceivable basis rationally supports it." *Id.* at 790 (emphasis in original). The Township "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* (quoting *Beach Cmmc'ns*, 508 U.S. at 315).

The Stanislaws have not refuted every conceivable basis which may have supported the Township's actions here.[6] *See Loesel*, 692 F.3d at 465. Most importantly, multiple neighboring property owners complained to Township officials throughout the years that the Stanislaws were operating a junk yard. *See, e.g.*, DE 62-2, Ex. 15, Page ID 1172 (letter from a district commissioner

---

[6] The dissent argues that the question is not whether there was a rational basis to deny the Stanislaws a license but whether there was a rational basis to treat the Stanislaws differently. *See* Dissent at 29–30. Ultimately, the question of whether there was a rational basis to deny the Stanislaws a license naturally merges with whether there was a rational basis to treat the Stanislaws differently. But putting that aside, for the same reasons there was a rational basis to deny the Stanislaws a license there would inevitably be a rational basis to treat them differently.

about neighbor Daniel Case dated July 11, 1990, "request[ing] help in dealing with a problem next door to" Case that "the owner has several junk cars on the lot which under [the Thetford Township] zoning code is not allowed"); DE 62-2, Ex. 16, Page ID 1174 (letter from neighbors Daniel and Marsha Case and Lillian Sheppard, dated September 26, 2005, writing that the Stanislaws are and have been "operating a Junk Yard or Automobile Graveyard," that they "feel the practices of this business have become an eyesore and possibly a nuisance," requesting the Township "review the site plan requirements" and imploring that the Stanislaws' business "comply with the applicable State and Thetford Township Ordinances concerning storage of vehicles[] [and] equipment and the maintenance of fencing and screening of storage areas and the correction and prevention of encroachment on our adjoining properties," and finally imploring "an investigation by your offices"); DE 60-14, ZBA Meeting Minutes, Page ID 731–32 (minutes of ZBA meeting at which Rhonda and Lillian Sheppard complained that, as late as August 30, 2017, the Stanislaws had "out door storage" of "rubbish, junk equipment and parts," that the Sheppards had taken photos of the property that day demonstrating the rubbish, that "[t]his has been going on since 1984," that the Stanislaws were operating a "junk yard" and that "[t]here is no way the cars that are parked out front can be runnable," with 30 to 40 cars on the property as well as "stacks and stacks of tires").

These detailed, consistent neighbor complaints create an adequate, rational justification for the Township to investigate and respond to its constituents' concerns. The complaint of multiple neighbors that the Stanislaws were operating a junk yard next door, and in one case that it was encroaching onto the neighbor's property, is a rational reason for the Township to investigate the Stanislaws and suspect a violation of the zoning ordinance. *See* DE 60-4, Angus Statement, Page ID 570 (noting Marc Angus's observation in 2005 based on his inspection that "[t]here were many disabled, salvage or junk vehicles on the property"). Indeed, there is no evidence in the record that

any of the other businesses received neighbor complaints. Nor did the other businesses cease operations at any point, function as a residence, yet still maintain 30 to 40 cars on the property. The dissent inappropriately analogizes to *City of Cleburne v. Cleburne Living Center* where the Supreme Court held that mere negative attitudes do not satisfy rational basis review. *See* Dissent at 32–33 (citing 473 U.S. 432, 447–48 (1985)). But the "mere negative attitudes" in *Cleburne* were not property nuisances, they were "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding[.]" *Id.* at 448. Considerations of nuisances or eye sores are exactly what is appropriate in a zoning proceeding as opposed to what the Supreme Court made clear was inappropriate in *Cleburne*: the dislike of the mentally disabled. *Id.*; *see also id.* at 461–62 (Marshall, J., concurring). As a result, we cannot say that the ZBA's actions in this case are "irrational" or completely "unsupported." *Trihealth*, 430 F.3d at 790–91. We therefore affirm the district court's grant of summary judgment for the Township.

## B.

We move on to Marc Angus.[7] As discussed above, the Stanislaws have disclaimed that their class of one theory is based on Angus's 2005 or 2011 license denials. Nor could they base their theory on each of these actions—the 2005 denial is precluded from our review by *Stanislaw I*, and the 2011 denial is precluded from our review by the Genesee County Circuit Court's undisturbed final judgment in 2012. The Stanislaws do not assert, and the record does not reveal,

---

[7] Plaintiffs cannot hold one official responsible for another's actions under § 1983, so they must allege that each official engaged in unlawful conduct to survive summary judgment. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934–35 (6th Cir. 2020). We note at the outset that the Argument Section of the Stanislaws' brief does not even name any individual defendant, let alone identify specific conduct by that defendant that violated the Equal Protection Clause. The Stanislaws thus have not created a genuine dispute of material fact about any individual defendant's conduct. *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1163 (6th Cir. 2021).

any other action taken by Marc Angus. We affirm the district court's order of summary judgment for Marc Angus.

C.

Next, we evaluate Dennis Bloss and Stuart Worthing. Dennis Bloss was a member of the Thetford Township Planning Commission, and Stuart Worthing was the Township's building inspector after Marc Angus. The Stanislaws appear to challenge Bloss and Worthing's inaccurate statements on the requirements of Ordinance No. 78 as applied to the Stanislaws—specifically, that they could not have a business and residence on the same property.

But again, the Stanislaws have failed to show any evidence of these individuals treating other property owners differently. Any inaction with respect to the other businesses cannot support an inference that Bloss or Worthing discriminated against the Stanislaws, especially when none of the other businesses received neighbor complaints as the Stanislaws did. Moreover, as discussed above, no other business was similarly situated in all material respects, as no other business had ceased operations yet maintained a residence on the same parcel for approximately 14 years. Ultimately, the Stanislaws must raise some evidence of disparate treatment, and here "there is simply no evidence to weigh." *Green Genie*, 63 F.4th at 529.

IV.

While the Township's rationales for denying the Stanislaws the licenses over the years to operate their business may be concerning, the Stanislaws have mounted one of the most difficult legal challenges—an equal protection class of one claim. Given the strict rational basis standard of review and the Stanislaws' failure to present evidence of materially similarly situated businesses, we affirm the judgment of the district court.

HELENE N. WHITE, Circuit Judge, dissenting. For over a decade, Thetford Township repeatedly denied the Stanislaws a vehicle dealer license based on shifting and demonstrably false rationales. At the same time, the Township purportedly allowed other similarly situated competitors to operate. The majority determines that there were rational bases to justify the Stanislaws' disparate treatment: neighbors complained about the property, and it allegedly functioned as a junk yard. I disagree with the majority's analysis, and accordingly dissent.

**I.**

First, the Stanislaws did not abandon their municipal-liability claim. To preserve on appeal a claim the district court rejected, a party need only "assert an argument, however limited, for reversal." *JPMorgan Chase Bank, N.A. v. First American Title Ins. Co.*, 750 F.3d 573 (6th Cir. 2014). Thus, to preserve a municipal-liability claim, a plaintiff must (1) identify an official action for which the municipality can be held liable under 42 U.S.C. § 1983, and (2) argue that the action caused a constitutional violation. *Hardrick v. City of Detroit, Mich.*, 876 F.3d 238, 244 (6th Cir. 2017). The Stanislaws have done so.

A municipality may be liable under § 1983 for the actions of "official[s] with final decision making authority." *Paterek v. Village of Armada, Michigan*, 801 F.3d 630, 651-652 (6th Cir. 2015) (quoting *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117-18 (6th Cir.1994)). In Michigan, "[t]he ZBA is a policymaking body within the Township, because its decisions are not reviewed by any superior officials." *Paeth v. Worth Twp.*, 483 F. App'x. 956, 964 (6th Cir. 2012). Thus, Thetford Township is liable for ZBA actions that cause constitutional violations. And as this court has previously noted, the ZBA approved the denials of the Stanislaws' license applications in 2005 and 2011. *Stanislaw II*, 2021 WL 3027195, at *1-*2. The Township can thus be liable for those

denials, and the Stanislaws repeatedly argue that "Thetford's denials" caused a constitutional violation. *See, e.g.*, Appellant's Brief, at 36.

The Stanislaws also identify other ZBA actions that contributed to the unequal treatment they faced. For example, the ZBA chairman told the Stanislaws that they could not keep a business and a residence on the same parcel, but the Township permitted the Stanislaws' competitor to do so. And another ZBA member ordered the Stanislaws to remove vehicles from their property, although competitors kept their properties in a similar condition.[1] These assertions are sufficient to preserve the Stanislaws' claim for appeal, and it is inaccurate to say the Stanislaws failed to "identify any municipal policy, practice, or specific ZBA action." Majority op. at 9. The majority further faults the Stanislaws for failing to cite *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). But a "missed citation to legal authority does not establish a forfeiture of an *argument*." *United States v. Charles*, 843 F.3d 1142, 1147 (6th Cir. 2016).

Indeed, it is important to remember that "the rule requiring all issues be raised in an opening brief is a court-made rule," and "its underlying rationale is to avoid surprise and prevent sandbagging of appellees." *Glennborough Homeowners Assoc. v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (quotations omitted). Here, the Township was not surprised by the municipal-liability claim. In their complaint, the Stanislaws asserted that "[t]he ZBA's decisions are the official policy of the Township, and if its decisions to deny certain zoning approvals violate federal

---

[1] The majority asserts that individual ZBA members' actions cannot give rise to municipal liability because they "are not *municipality* actions." Majority op. at 9–10 n.4. It is unclear whether that is true here. A municipality may be liable for an individual official's actions where the official has enough "responsibility" that his "acts or edicts may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-82 (1986). The ZBA's actions "are not reviewed by any superior officials," *Paeth*, 483 Fed. App'x. at 964, so it is possible that individual ZBA members have enough "responsibility" that their "acts or edicts may fairly be said to represent" Township policy, *Pembaur*, 475 U.S. at 480. But even if the acts of individual ZBA members do not give rise to municipal liability, the majority does not dispute that the license denials themselves—which were approved by the ZBA as a whole—are official Township actions sufficient for municipal liability under § 1983. By arguing that the Township can be held liable for those denials, the Stanislaws have preserved their municipal-liability claim for appeal.

constitutional rights, the Township is accountable under 42 USC [§] 1983." R. 1-1, PID 22 (citing *Monell*, 436 U.S. at 690, and *Paeth*, 483 F. App'x at 964). The Township has had ample opportunity to argue that it cannot be held liable under *Monell* for the ZBA's actions. But it has never done so—not in its motion for judgment on the pleadings, not in its motion for summary judgment, and not in this appeal. Nor has the Township argued on appeal that the Stanislaws forfeited or abandoned their municipal-liability claim.[2]

Further, after this court discussed the municipal-liability claim at oral argument, the Stanislaws submitted a letter under Federal Rule of Civil Procedure 28(j), explaining that "the ZBA 'is a policymaking body,' and a deliberate discretionary act, including the type the Thetford Township ZBA took, is one to which 'municipal liability pursuant to *Monell* can attach.'" CA6 R. 24, P. 1 (quoting *Paeth*, 483 F. App'x. at 964-65) (brackets omitted). The Township did not respond. In sum, although the Stanislaws' framing of the issue has not been ideal, the Township has known all along that the Stanislaws are claiming municipal liability based on the ZBA's actions, "so there is no surprise to prevent." *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 424 (6th Cir. 2022); *see also Hardrick*, 876 F.3d at 244 (considering an otherwise-forfeited municipal-liability argument because the defendant-appellee had a "chance to brief" the issue).

I also disagree with the majority's conclusion that, at oral argument, counsel for the Stanislaws waived any claim tied to the Township's 2011 denial. *See* Maj. op. at 6. It is true that, during oral argument, counsel said that the Stanislaws were challenging Angus's second denial

---

[2] The Township mentions *Monell* in its brief in a single paragraph. It explains that the District Court held that where there is "no underlying constitutional act," "there can be no *Monell* municipal liability." Appellee Brief at 32. The Township states that the "Plaintiffs do not challenge this ruling on appeal." *Id.* But the Township does not say that the Stanislaws forfeited the argument that where there is an underlying constitutional violation, the Township can be held liable for it. And the Township does not contest the proposition that municipal liability attaches to unconstitutional actions of the ZBA. Nor does it contest the assertion that it can be held liable under *Monell* for the license denials if the denials were unconstitutional. Its only argument is that the denials *were* constitutional, and thus, since there is no underlying unconstitutional act, there can be no *Monell* liability.

from 2013. However, Angus's second denial took place in 2011, not 2013, so counsel's statement did not make sense. The Stanislaws' briefs make clear that they are challenging the 2011 denial, and counsel stated repeatedly at oral argument that the Stanislaws were challenging Angus's second denial. Thus, it is likely that the Stanislaws' counsel simply misspoke or misremembered the year of the second denial. Regardless, counsel's statements do not demonstrate a "clear and compelling" waiver of the Stanislaws' challenge to the 2011 denial. *Id.*

## II.

The majority next holds that res judicata bars this court from considering many of the relevant facts in this case. As the majority sees it, *Stanislaw I*—the suit involving the Stanislaws' prior equal protection claim against Thetford Township—precludes consideration of the Township's actions between 2005 and 2009. Majority op. at 6–8, 15. And the Genesee County Circuit Court's judgment affirming the ZBA's approval of the Township's 2011 license denial precludes consideration of events surrounding that denial. *Id.* The result is a blinkered analysis: In a case with relevant facts stretching back to the 1980s, the majority considers only what occurred "between 2013 and 2018." *Id.* at 8. For several reasons, I disagree with that approach.

To start, the Township appellees have not argued on appeal that res judicata bars any part of the Stanislaws' claim. "[R]es judicata is an affirmative defense that should be raised by the defending party," and "[c]ourts generally lack the ability to raise an affirmative defense sua sponte." *Hutcherson v. Lauderdale Cnty.*, 326 F.3d 747, 756 (6th Cir. 2003). A court may raise res judicata sua sponte only "in special circumstances," *Arizona v. California*, 530 U.S. 392, 412 (2000), such as when "[t]he defense was not available to Defendants prior to their filing their motion," *Hutcherson*, 326 F.3d at 757.

The majority asserts that considering the issue sua sponte conserves judicial resources. Majority op. at 7 n.2. It is unclear why that is so. Res judicata was already litigated in this case: When the Stanislaws brought this action, the Township moved for judgment on the pleadings and argued that res judicata precluded the Stanislaws' equal protection claim. R. 25, PID 161. The district court agreed and granted judgment to the Township. R. 30, PID 411-418, 425. The Stanislaws appealed, and this court reversed—explaining in a thorough opinion that res judicata does *not* bar the equal protection claim. *Stanislaw v. Thetford Twp., Mich., et al.* (*Stanislaw II*), No. 20-1660, 2021 WL 3027195, at *3-*5 (6th Cir. July 19, 2021). The Township then declined to raise res judicata at summary judgment and in this appeal. Thus, by raising the issue sua sponte, the majority spends judicial resources re-litigating an issue this court settled in a prior appeal in the very same case—an issue that neither party has asked this court to address. That undermines the majority's efficiency interests. *See* Majority op. at 7 n.2 (expressing an interest in "protecting litigants from the burden of relitigating an identical issue" (quotation omitted)).

On the merits, the majority incorrectly concludes that res judicata precludes the Stanislaws' equal protection claim. In *Stanislaw II*, this court reversed the district court's holding that *Stanislaw I* precluded the Stanislaws' equal protection claim. This court explained that "[r]es judicata is not applicable where a subsequent lawsuit alleges ongoing unlawful conduct, even if it is of the same nature as the conduct giving rise to the prior action, so long as the events giving rise to the subsequent action occurred after the first action was filed." *Stanislaw II*, 2021 WL 3027195, at *4 (citing *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 324, 327-28 (1955) and *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 601-603 (2016)). While *Stanislaw I* involved events between 2005 and 2009, this suit involves "post-2009 misconduct," including "the Township's

shifting justifications proffered after 2009 for why the Stanislaws could not operate their dealership business on their property." *Stanislaw II*, 2021 WL 3027195, at *3-*5.

The majority agrees that *Stanislaw I* does not preclude consideration of *post*-2009 conduct, but it concludes that any events between 2005 and 2009 "are precluded from consideration now." Majority op. at 8 n.3. I disagree. *Stanislaw II* held that the Stanislaws *can* use pre-2009 conduct to support their claim: "[W]hile they cannot relitigate any claims or issues *solely* based on the events of 2005 to 2009," those events "may inform the allegations of a pattern of discriminatory treatment regarding post-2009 misconduct." *Stanislaw II*, 2021 WL 3027195, at *5 (emphasis added) (citing *Bronson v. Board of Education*, 687 F.2d 836, 841 (6th Cir. 1982)). Yet the majority categorically refuses to consider any of the Township's pre-2009 conduct. It does not consider, for example, the Township's 2005 denial of the Stanislaws' licenses, or the Township's concurrent approval of licenses to the Stanislaws' competitors in 2005 and 2006.[3] Thus, the majority does the opposite of what *Stanislaw II* instructs by refusing to consider "the events of 2005 to 2009" in analyzing the "pattern of discriminatory treatment" the Stanislaws faced. *Stanislaw II*, 2021 WL 3027195, at *5.

The majority asserts that this logic would permit the Stanislaws to file endless suits against the Township so long as they add a "new" factual allegation to each suit. Majority op. at 8 n.3. But *Stanislaw II* did not hold that any new factual allegation defeats res judicata. Rather, it applied the settled principle that res judicata does not preclude a claim "predicated on new material events postdating the filing of the initial complaint" in the prior suit. *Stanislaw II*, 2021 WL 3027195, at *4 (citing *Whole Woman's Health*, 579 U.S. at 601-603, and Restatement (Second) of Judgments

---

[3] The majority *does*, however, justify the Township's post-2009 conduct using pre-2009 events, illustrating the relevance of such conduct in analyzing post-2009 events. *See, e.g.*, Majority op. at 14 (citing 2005 neighbor complaints and Angus' 2005 claim that the Stanislaws' kept "junk" on the property).

§ 24 (1980)). When a party raises such a claim, she may use allegations made in a prior case to "inform" the "pattern of discriminatory treatment" alleged in the current case. *Id.* at *5 (citing *Bronson*, 687 F.2d at 841). Thus, for the Stanislaws to defeat res judicata in a future case, they would need to bring claims "predicated on new material events" not litigated here; it would be insufficient to file a new equal protection claim based on the same license denials with a few new allegations thrown in. *Id.* at *4.

The majority also wrongly concludes that the Genesee County Circuit Court's 2012 judgment precludes the Stanislaws' claim. "Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." *Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir. 2007). In other words, the Genesee County Circuit Court's judgment is no more or less preclusive in this court than it would be in a Michigan state court. In Michigan, res judicata applies where: (1) "the prior action was decided on the merits," (2) "both actions involve the same parties or their privies," and (3) "the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004).

Applying those principles, the Michigan Supreme Court has held that where a state circuit court sits in review of a local ZBA, the circuit court's judgment "[i]s not res judicata on [a] plaintiff's constitutional claims" arising from the same set of facts because a ZBA lacks jurisdiction to decide constitutional claims, and "the circuit court's review is confined to the record and decision of the zoning board of appeals." *Houdini Properties, LLC v. City of Romulus*, 743 N.W.2d 198 (Mich. 2008). As this court has explained, "res judicata does not apply to a plaintiff's constitutional claims arising from the same facts" "presented in an appeal from a ZBA's decision." *Jon Jon's Inc. v. City of Warren*, 534 F. App'x 541, 544 (6th Cir. 2013) (citing *Houdini*, 743 N.W.2d at 198-199).

Here, the Genesee County Circuit Court issued its judgment on appeal from the Thetford Township ZBA's approval of the denial of the Stanislaws' license applications. In issuing that approval, the ZBA did not—and could not—consider any constitutional arguments. *See* R. 60, PID 596-600. On appeal, the circuit court was thus itself "barred from ruling on constitutional issues," *Jon Jon's*, 534 F. App'x at 544, which means its judgment "was not res judicata on the [Stanislaws'] constitutional claims," *Houdini*, 743 N.W.2d at 198. Because Michigan courts would not apply res judicata to the circuit court's decision, this court cannot either.

The majority asserts that Michigan courts would apply res judicata to the Genesee County Circuit Court's decision because "the circuit court explicitly considered the equal protection argument and rejected it." Majority op. at 7 (citing R. 60-7, PID 638-39). But in *Houdini*, the circuit court similarly purported to "rule[] on the plaintiff's taking[s] claim" in affirming the ZBA's decision. 743 N.W.2d at 200 (Corrigan, J., dissenting). The Michigan Supreme Court held that the circuit court lacked jurisdiction to "rule on takings issues in the plaintiff's appeal," *even though* the circuit court had purported to decide those issues. *Id.* at 199. In other words, *Houdini* declined to apply res judicata not because the circuit court failed to consider constitutional claims, but because the circuit court lacked the power to rule on the constitutional claims it *had* considered. *Id.* So here, it is irrelevant whether the circuit court purported to "consider[] . . . and reject[]" the equal protection argument, as the majority asserts. Majority op. at 7. Either way, the circuit court lacked jurisdiction to rule on the equal protection claim, so its decision cannot preclude that claim here. *Houdini*, 743 N.W.2d. at 199; *see also Get Back Up, Inc. v. City of Detroit*, 878 F.Supp.2d 794, 806–08 (E.D.Mich. 2012) (under *Houdini*, a Michigan circuit court's adjudication of a ZBA

appeal cannot preclude later constitutional claims "even if, in deciding that appeal, the state [circuit] court resolved the very federal-law claims now before this Court").[4]

The majority asserts that in *Jon Jon's v. City of Warren*, 534 F. App'x 541 (6th Cir. 2013), this court read *Houdini* to permit the application of res judicata where a circuit court sitting in review of a ZBA appeal chooses to "separate" the appeal from any constitutional claims the parties raised during litigation. Majority op. at 7-8. In the majority's view, by "consider[ing] the equal protection argument," the Genesee County Circuit Court effectively "separate[d]" that argument from the ZBA appeal—and thus the circuit court's disposition of that issue has res judicata effect here. *Id.*

I disagree with the majority's reading and application of *Jon Jon's*. In *Jon Jon's*, a business sought a zoning variance from a township ZBA. *Id.* at 542. While the ZBA proceeding was pending, the township filed a parallel civil suit in a Michigan circuit court, seeking a declaratory judgment that the business had lost its zoning status. *Id.* at 542. The business filed a counterclaim in that civil suit, raising constitutional claims against the township. *Id.* When the ZBA denied the zoning variance, the business amended its counterclaim to include *both* the constitutional claims *and* "an appeal of the ZBA's decision." *Id.* The state circuit court chose to treat the matter "solely

---

[4] It is also not clear that the Genesee County Circuit Court actually did consider or rule on the Stanislaws' equal protection claim. The circuit court noted that the Stanislaws had "advanc[ed] [an] equal protection argument," but the court stated that the "main issue[] before" it was "whether there's compliance with the constitution of statutes." R. 60-7, PID 638. The court then stated that, "other than" the equal protection argument, "the law has been followed, proper procedure has [been] followed, [and] there's competent material and substantial evidence on the record with respect to the procedures of the Zoning Board of Appeals and Mr. Angus." R. 60-7, PID 639. On that basis alone, the court found that it "ha[d] to affirm [the] ZBA's decision[,] completely understanding there's many issues." *Id.* at 639. It is unclear what the circuit court meant by the "constitution of statutes." But it appears that the court *declined* to rule on the equal protection argument—rather, it affirmed because the zoning decisions complied with "proper procedures" under state law, while recognizing that the equal protection argument was one of "many issues" that its ruling did not address. *Id.* But even if the circuit court had purported to rule on the equal protection issues, *Houdini* still holds that such a ruling has no res judicata effect on a future equal protection claim.

as an appeal from the ZBA's decision," and affirmed the ZBA on state-law grounds. *Id.* at 543–44.

When the business brought the same constitutional claims in federal court, the township argued that res judicata applied. *Id.* at 544. The township asserted that *Houdini* was distinguishable because "in *Houdini*, the state circuit court was not simultaneously confronted with both an administrative appeal from a ZBA" and a separate lawsuit filed originally in the circuit court that included "separately-pled [constitutional] counterclaims." *Id.* at 544. This court reasoned that the difference would have mattered if the circuit court had treated the ZBA appeal and the civil suit as "separate" because a state circuit court ordinarily has jurisdiction to decide constitutional claims as part of a typical civil suit—the circuit court is only barred from reaching constitutional issues when it sits in review of a ZBA. *Id.* (citing *Houdini*, 743 N.W.2d at 198-99). So if the circuit court had "separate[d]" the ZBA appeal from the parallel civil suit, it may have been able to address the constitutional issues while adjudicating the civil suit. *Id.* But instead, the circuit court treated the case "solely as an appeal from the ZBA's decision," so "the circuit court was without jurisdiction to consider Plaintiffs' constitutional claims." *Id.* That decision is consistent with a proper reading of *Houdini*.

Here, the constitutional claims were never raised as part of a parallel civil suit—rather, they were raised only as part of the ZBA appeal. Indeed, no parallel civil suit was filed, so the circuit court did not have the option to "separate" the ZBA appeal from some other proceeding. For those reasons, this case is materially identical to *Houdini*: A party raised a constitutional claim as part of a ZBA appeal, the circuit court purported to rule on that claim, and the party later raised the same claim in a separate action. The circuit court's decision is thus "not res judicata on the . . . constitutional claims." *Houdini*, 743 N.W.2d at 198.

**III.**

I disagree as well with the majority's conclusion that the Stanislaws presented no viable comparators. In determining whether the Stanislaws are similarly situated to an alleged comparator, we do not demand an "exact correlation," but instead seek "relevant similarity." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (quoting *Bench Billboard v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012)). "[T]he degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004)). As a result, determining whether alleged comparators are similarly situated to the plaintiff is "generally a factual issue for the jury." *Loesel*, 692 F.3d at 463 (quoting *Eggleston v. Bieluch*, 203 Fed. App'x. 257, 264 (11th Cir. 2006)). Thus, summary judgment on a class-of-one claim should be granted for a defendant only where no jury could "reasonably conclude[]" that an alleged comparator is similarly situated, *id.* at 464—for instance, where the "evidence was one-sided, leaving nothing favoring" the plaintiff, *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521 (6th Cir. 2023).

In the zoning context, *Loesel* is the best example of the comparator analysis. *See id.* In that case, the Loesels intended to sell their land to Wal-Mart for a new store. *Id.* at 459–60. In response, Frankenmuth created a new zoning type that prohibited retail establishments with greater than 65,000 square feet of retail space. *Id.* The new zoning type applied only to the "Loesels' property and a handful of much smaller parcels in its immediate vicinity." *Id.* at 459. The Loesels brought a class-of-one equal protection claim, citing two alleged comparators: Bronner's Christmas Wonderland and the Bavarian Mall. *Id.* at 463.

Frankenmuth first argued that the comparators were not similarly situated because the Loesels' property was zoned differently than Bronner's and the Bavarian Mall. *Id.* at 464. However, except for the 65,000-foot rule, the two zones were subject to "essentially the same regulations." *Id.* Thus, a jury could conclude that the "difference in 'labels' for these commercially zoned properties is not material." *Id.* The city next argued that the properties were not similarly situated because the Loesels' property was vacant, but the comparators' properties were already developed. *Id.* However, the zoning for all the land allowed development of new commercial properties. *Id.* Accordingly, a "jury could have reasonably concluded that the developed/undeveloped distinction is not material." *Id.* Finally, the city argued that the properties had different traffic capacities. *Id.* At the entrance to Bronner's and the Bavarian Mall, the street had five lanes. *Id.* In contrast, the road in front of the Loesel's property had only three lanes. *Id.* This court held that a reasonable jury could conclude the difference was not material, in part because the Loesels' could theoretically add two lanes to the road abutting their property. *Id.* at 465.

The majority departs from *Loesel* in making judgments that should be left to a jury. For example, the majority asserts that two businesses—Belott & Son and Duquette's Garage—are not similarly situated to the Stanislaws' business because they applied for a Class B license only (which permits the sale of used cars), but the Stanislaws also applied for a Class C license (which permits the sale of used car *parts*). This argument may have been compelling had the Township granted the Stanislaws a Class B license but denied them a Class C license. Instead, however, the Township denied the Stanislaws *all* the licenses they sought, including a Class B license. Thus, a jury could reasonably conclude that this difference is immaterial because the Township still discriminated against the Stanislaws in denying a Class B license.

The majority also dismisses Hi-Speed as a comparator, even though the business had applied for and received Class B and C licenses. To distinguish the two, the majority argues the properties differ because the Stanislaws maintained a residence on the same plot as their business, while Hi-Speed did not. However, this rationale was debunked by the state court and by the ZBA, which acknowledged that the Stanislaws' residence on the property could not serve as a basis to deny the licenses. Thus, given the fact that state proceedings already established this reason was faulty, a jury could conclude that this distinction is not relevant to the comparator analysis.[5]

Finally, the majority dismisses Monster Auto as a comparator because there is no evidence in the record specifying what licenses the business held. While that may be true, the Stanislaws produced evidence showing that Monster Auto operated as a junk yard. Pictures of the property show piles of tires, wrecked automobiles, and trash strewn across the parking lot. Monster Auto also advertised its scrap business. This would allow a jury to infer that Monster Auto was permitted to operate as a junk yard while the Stanislaws were denied their licenses.

Some differences between a plaintiff and an alleged comparator disqualify the two from being similarly situated, but it is "generally . . . for the jury" to decide whether a "distinction is . . . material." *Id.* at 463-65. A court should not take that decision away from the jury unless the evidence is "one-sided." *Green Genie*, 63 F.4th at 529. Our court applied these principles in *Lousel* when it required a jury to determine whether differences between two properties—e.g., their zoning classification or traffic capacity—were relevant to the comparator inquiry. Because a jury could reasonably conclude that any differences between the Stanislaws and their

---

[5] The majority also distinguishes the two businesses by arguing that Hi-Speed never applied for a Class E license (which permits the transportation of distressed vehicles, i.e., a towing service). However, the Stanislaws only applied for a Class E license in 2005. In 2011, they applied only for Class B and C licenses, the very same ones sought by Hi-Speed.

comparators are irrelevant (and, in the case of Hi-Speed, completely nonexistent), summary judgment was improper.

## IV.

Although the "'rational basis' standard is the least demanding test used by the courts to uphold legislative action, it is not 'toothless.'" *Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). In our circuit, plaintiffs have repeatedly succeeded on equal-protection claims even where the rational basis test was applied. *See id.* (striking down a lawn-related ordinance that irrationally applied only to a certain subset of properties); *Johnson v. Morales*, 946 F.3d 911, 940 (6th Cir. 2020) (allowing class-of-one claim to proceed where defendant shut down the plaintiff's establishment but not a similarly situated one); *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 650 (6th Cir. 2015) (denying summary judgment where plaintiff's business was prohibited from operating despite similarly situated comparators being allowed to stay open); *Loesel*, 692 F.3d at 466 (denying summary judgment where city discriminatorily zoned plaintiff's property to prevent construction of a Walmart despite other large retail establishments being allowed to operate). The majority's analysis makes four significant mistakes.

### A.

First, the majority misapplies the standard for class-of-one claims. According to the majority, the Township had a rational basis to deny the Stanislaws' application: The Stanislaws had violated municipal rules by operating a junk yard. Maj. op. at 11. However, the question is not whether there was a rational basis to deny the Stanislaws a license in isolation, but whether there was a rational basis to treat the Stanislaws differently than other similarly situated property owners. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) ("The Equal

Protection Clause prohibits discrimination by government which . . . intentionally *treats one differently than others similarly situated* without any rational basis for the difference." (emphasis added)). Here, the Stanislaws cite evidence showing that their property was maintained similarly to the comparators. *See, e.g.*, R. 62-2, PID 926 ("Belott did not have fencing then (or now), and at all relevant times also had vehicles in various states of disrepair on its property."); R. 62-2, PID 927 ("Like Grand Auto Plaza and like Belott, Duquette's has never had fencing, and also has vehicles on its property waiting for repair and sale."); R. 62-2, PID 927 ("Due to its parts sales Hi-Speed frequently had vehicles in disrepair on its property and various parts in storage, but has never had any fencing."); R. 62-2, PID 928 ("[Monster Auto] openly dismantled vehicles, displayed auto parts for sale and advertised auto parts sales.); R. 62-2, PID 1157–61 (photographs of Monster Auto's property showing junk cars, a pile of tires, and other auto parts strewn across the area).

After considering this evidence, a jury could reasonably conclude that, because the alleged comparators operated their businesses in a materially indistinguishable manner to the Stanislaws, the "junk yard" rationale was not a rational basis for the disparate treatment. *See e.g.*, *Morales*, 946 F.3d at 940 (allowing a class-of-one claim to proceed where the city shut down the plaintiff's establishment after a shooting took place there but allowed a similarly situated business to continue operating when the same occurred). These disputed issues of material fact should preclude summary judgment for the Township.

**B.**

The very question whether the Stanislaws illegally operated a junk yard is also in dispute. The majority cites the following evidence in favor of a finding that the Stanislaws illegally operated a junk yard: (1) Angus's letter citing junked vehicles as the reason for denying the

Stanislaws' permit, (2) Angus's letter denying the Stanislaws a permit a second time "for the same reason set forth in the . . . 2005 disapproval," (3) the Township's 2013 decision to initiate blight proceedings against the Stanislaws, (4) the subsequent settlement in which the Township agreed to dismiss the proceedings in exchange for the Stanislaws cleaning up their property, (5) complaints from the Stanislaws' neighbors about the state of the property; (6) the city's zoning code, which purportedly prohibited the Stanislaws from storing junked vehicles on their property, and (7) the fact that the Stanislaws' business was potentially on hiatus for several years due to Joseph's health issues.

However, the Stanislaws dispute the allegation, citing an affidavit saying that the cars on the property were not junked because they "were in repairable condition and [Joseph] intended to repair and sell them," R. 62-2, PID 925. For support, the Stanislaws cite a study showing that their business sold an average of forty-five percent of its inventory each year, even taking into account the slower years when Joseph was sick. Further, the Stanislaws argue that because the Township's ordinances placed no restrictions on the types of vehicles that dealers can sell or repair, the mere existence of vehicles in poor condition was not sufficient to meet the definition of a junk yard as long as their business's plan was to repair or sell them. *See* R. 62-2, PID 955 (ordinance defining automobile repair as "general repair, engine rebuilding, rebuilding or reconditioning of motor vehicles; collision service, such as body, frame, or fender straightening and repair; overall painting and undercoating of automobiles.").

The Stanislaws additionally argue that even if their property had junk on it, they complied with the Township's rules. Although the Township generally prohibits junk yards, it has an exemption allowing individuals to store junk vehicles "upon the premises of a properly zoned property, junk buyer, dealer in used auto parts, dealer in second hand goods or junk." R. 62-2,

PID 1166. The Stanislaws were licensed auto-parts dealers until they were denied a license in 2005, meaning that they were permitted to openly dismantle vehicles on their property—even under the Township's own rules. Although the Stanislaws were permitted to operate a junk yard at the time, the Township still rejected their 2005 application on that purported basis.

The Stanislaws also note that the Township consistently granted them licenses from 1983 to 2005, and again after 2018, despite no material changes to their property. The Stanislaws argue that the blight proceedings are irrelevant because they began years after their licenses were denied and because their property largely remained in the same condition even after the city's blight complaint was dismissed. For evidence, the Stanislaws cite to the complaints of their neighbors, who continued to complain about the state of the property without regard to whether their licenses were approved or denied. Accordingly, a jury could reasonably conclude that either the Stanislaws were not operating a junk yard or that the rationale does not explain why the Township denied the Stanislaws a permit between 2005 and 2018, but not for the other decades when the business was operating in the same fashion.

## C.

Alternatively, the majority concludes that the neighbors' complaints constitute a rational basis to treat the Stanislaws differently from their competitors. However, the Supreme Court has held that neighbor complaints alone—absent any other legitimate government interest—cannot serve as a rational basis for disparate treatment in zoning decisions. In *City of Cleburne, Tex. v. Cleburne Living Center*, a city council required a mental-health facility to obtain a permit to operate, even though it "freely permitted" "other care and multiple-dwelling facilities" to operate permit-free. 473 U.S. 432, 447-48 (1985). The city argued the disparate treatment was justified by "the negative attitude of the majority of property owners located within 200 feet" of the mental-

health facility. *Id.* at 448. Applying rational-basis review, the Court rejected that argument. "[M]ere negative attitudes," the Court explained, "are not permissible bases" for the disparate treatment of similarly situated properties, especially where those attitudes are "unsubstantiated by factors which are properly cognizable in a zoning proceeding." *Id.* That is because "the law cannot, directly or indirectly, give . . . effect" to "private biases." *Id.* (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)). Accordingly, the Township may not evade the constraints of the Fourteenth Amendment "by deferring to the wishes or objections of some fraction of the body politic." *Id.; see also id.* ("[T]he electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause.").

So too here: The Township cannot treat the Stanislaws differently than their similarly situated competitors based solely on the "negative attitudes" of the Stanislaws' neighbors. *Id.* By allowing the Township to discriminate against the Stanislaws because of "neighbor complaints," the majority permits what *Cleburne* forbids. Maj. op. at 12.

The majority asserts that the Township's treatment of the Stanislaws was not based on "negative attitudes" alone, but also on "[c]onsiderations of nuisances or eye sores." Majority op. at 15. That is just a restatement of the majority's junk-yard rationale. The Township believed the Stanislaws' property was an eye sore and a nuisance only because it allegedly contained car parts and similar "junk." But as explained above, several comparators kept their properties in a similar condition. The real difference, then, is not that the Stanislaws' property was allegedly an eyesore; it is that neighbors *complained* about the Stanislaws, while "there is no evidence in the record that any of the other businesses received neighbor complaints." *Id.* at 14–15. Thus, the rationale that explains the Township's disparate treatment of the Stanislaws is "mere negative attitudes" towards

an otherwise permitted use, which the Supreme Court has held cannot provide a rational basis for zoning decisions. *Cleburne*, 473 U.S. at 448.

In response, the majority argues that *Cleburne* held only that it is "inappropriate" for the government to make zoning decisions based on a "dislike of the mentally disabled." Majority op. at 15. But the opinion contains no such distinction. Indeed, the *Cleburne* plaintiffs' primary argument was that the challenged zoning decision was "invalid on its face" because the government had "discriminated against" the mentally disabled. 473 U.S. at 437. Yet the Court rejected that argument. It held that—unlike "race, alienage, or national origin"—mental disability is *not* a suspect classification subject to heightened scrutiny. *Id.* at 441, 446-447. The Court then proceeded to evaluate whether the zoning decision had any rational basis; it concluded that "negative attitudes" and the "objections of some fraction of the body politic" were insufficient. *Id.* at 448. In conducting that rational basis analysis, the Court did not specifically mention dislike for the mentally disabled or limit its holding to "negative attitudes" based on that particular kind of prejudice. *Id.* at 448. Here, if the Stanislaws and their comparators complied with the zoning ordinances, the neighbors' complaints should have been deemed irrelevant.

The Stanislaws also cite evidence to refute the assertion that the complaints were a "likely" or "conceivable" reason for their license denial. *See Andrews v. City of Mentor*, 11 F.4th 462, 477-78 (6th Cir. 2021) (quoting *In re City of Detroit*, 841 F.3d 684, 702 (6th Cir. 2016)). The Stanislaws show that their licenses were denied for the first time shortly after Daniel Case, one of the complaining neighbors, joined the Zoning Board of Appeals. From this fact, a jury could reasonably infer that the licenses were denied not due to the neighbors' complaints, but due to the personal grievance of a member on the ZBA. The Stanislaws also cite evidence that the neighbors continued to complain even during the years when they had their licenses granted. *See* R. 62-2,

PID 1172 (complaint from 1990); *id.* at 1174 (complaint from 2005); R. 60-14, PID 731–32 (complaint from 2017); R. 62-1, PID 913–14 (detailing complaints in 2022). For example, the Township's attorney Otis Stout testified in 2022, the same year that the Stanislaws successfully renewed their license, the "complaints keep coming in." R. 62-1, PID 913–14. A jury could thus reasonably infer that the neighbors' complaints were not a rational basis to deny the Stanislaws' licenses because the timing of the complaints did not correlate with the license denials.

## D.

Finally, the majority ignores *Loesel*, a key precedent holding that a jury generally decides whether a defendant had a rational basis to treat the plaintiff differently. 692 F.3d at 466. In that case, the government proffered numerous rationales for its differential treatment—including, for example, protecting the value of nearby residential property, concerns about the lot's traffic capacity, potential storm-water retention issues, and the goal of making the city's downtown area more friendly to pedestrians. *Id.* at 465–66. But the *Loesel* plaintiffs presented evidence to "contradict[]" and "undercut" the government's explanations, such that a jury could find that the government's proffered rationales were not "conceivable" bases for its actions. *Id.* Here too, the Stanislaws have provided ample evidence to contradict and undercut the government's junk-yard and neighbor-complaint rationales. This case should go to trial too. Accordingly, I dissent.